FT. WORTH & D. C. RY. CO. v. LIMBERG.

(Court of Civil Appeals of Texas. Ft. Worth.
Dec. 7, 1912. Rehearing Denied
Jan. 25, 1913.)

1. MASTER AND SERVANT (§ 264*)—PLEADING
AND PROOF—VARIANCE.

In an action by servant for injuries caused
by the swinging of a cement block against his
leg, an allegation that the engineer was negli-
gent in failing to stop the block according to
the customary method of doing the work, and in
causing it to swing around with unnecessary
force, and that as a result the injuries were
caused, is sufficient to warrant proof that the
servant was sitting on the same car on which
the derrick used to lift the block was located,
although in another part of the petition it was
averred that he was sitting on the car upon
which the block was to be loaded; the variance
being immaterial.

[Ed. Note.—For other cases, see Master and
Servant, Cent. Dig. §§ 861–876; Dec. Dig. §
264.*]

2. MASTER AND SERVANT (§ 289*)—INJURIES
TO SERVANT — ACTIONS — QUESTIONS FOR
JURY.

In a personal injury action by a servant,
held that, under the evidence, the question of
the master's liability on the theory of discover-
ed peril was for the jury.

[Ed. Note.—For other cases, see Master and
Servant, Cent. Dig. §§ 1089, 1090, 1092–1132;
Dec. Dig. § 289.*]

3. MASTER AND SERVANT (§ 289*)—INJURIES
TO SERVANT—QUESTIONS FOR JURY.

In a personal injury action by servant, the
question of the servant's contributory negligence
held, under the evidence, for the jury.

[Ed. Note.—For other cases, see Master and
Servant, Cent. Dig. §§ 1089, 1090, 1092–1132;
Dec. Dig. § 289.*]

4. TRIAL (§ 253*)—INJURIES TO SERVANT—
INSTRUCTIONS.

In a personal injury action by servant, an
instruction eliminating the issue of discovered
peril which was raised by the evidence is prop-
erly refused.

[Ed. Note.—For other cases, see Trial, Cent.
Dig. §§ 613–623; Dec. Dig. § 253.*]

5. TRIAL (§ 194*)—INSTRUCTIONS—WEIGHT OF
EVIDENCE.

In a personal injury action by servant who
was struck by a cement block as it was swung
by derrick boom, an instruction that it was the
duty of the engineer to operate the engine in
accordance with signals given by plaintiff, and
if the cement block was not stopped when it
reached a point directly under the end of the
boom, and if no signal was given the engineer
to stop the block at that place, then his failure
was not negligence, is improper, being on the
weight of the evidence.

[Ed. Note.—For other cases, see Trial, Cent.
Dig. §§ 413, 436, 439–441, 446–454, 456–466;
Dec. Dig. § 194.*]

6. DAMAGES (§ 132*)—PERSONAL INJURIES—
MEASURE OF DAMAGES.

An award of $6,500 to a servant whose
foot was crushed was not excessive where it
appeared at the time of the accident he was
earning from $120 to $135 a month, but that
since the injury he had been unable to do any
manual labor, the only occupation for which he
was fitted by education, the foot being in such a
condition that he could not stand on it or use
it for any great length of time.

[Ed. Note.—For other cases, see Damages,
Cent. Dig. §§ 372–385, 396; Dec. Dig. § 132.*]

Appeal from District Court, Tarrant Coun-
ty; W. T. Simmons, Judge.

Action by E. H. Limberg against the Ft.
Worth & Denver City Railway Company.
From a judgment for plaintiff, defendant ap-
peals. Affirmed.

Spoonts, Thompson & Barwise and J. M.
Chambers, all of Ft. Worth, for appellant.
W. P. McLean, Sr., and R. L. Carlock, both
of Ft. Worth, for appellee.

DUNKLIN, J. E. H. Limberg, an employé
of the Ft. Worth & Denver City Railway
Company, in a suit against the company re-
covered judgment for $6,500 as damages for
personal injuries sustained by him, and the
defendant has appealed.

The injury occurred substantially in the
following manner: A crew of men were en-
gaged in loading cement blocks, each weigh-
ing approximately 2,000 pounds, upon a car.
Plaintiff was foreman in charge of the
work, and the crew were working under his
direction. A derrick was used which was
operated by an engine, and the plan of doing
the work was to drag in the block to a point
near the car, then attach grappling hooks to
it, and, after lifting it from the ground,
swing the boom pole around, carrying the
block suspended from the end and place the
block upon the car. On the occasion of the
accident, a chain having been attached to
one of the cement blocks, plaintiff signaled
the engineer in charge of the engine to draw
in the block, which was done. In thus draw-
ing it in the block was lifted sufficiently
from the ground to cause it to swing against
the side of the car where plaintiff was sit-
ting, striking one of his legs which was
there suspended while plaintiff sat on the
edge of the car. All this happened without
any movement of the boom pole of the der-
rick. This car was the one upon which the
engine was stationed, and attached to it was
the car upon which the block was to be
loaded.

[1] In his petition plaintiff alleged sub-
stantially that on the occasion of the acci-
dent the boom pole, with the block suspended
from the end of it was swung around and
thus the block was caused to strike his leg
hanging over the side of the car; and, fur-
ther, that the car upon which he was sitting
was the one upon which the block was to be
loaded. The basis of several assignments of
error is the contention that as the proof
showed that at the time of the injury plain-
tiff was sitting on the car upon which the
engine was located and not on the one upon
which the block was to be loaded, and as
the block swung against the car upon which
he was sitting while being dragged in and
before the contemplated swinging of the
boom with the block suspended therefrom,
there was a fatal variance between the proof
and the cause of action alleged. After al-

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

leging that the accident was caused in the manner above noted, and that the engineer in performing the work in that manner was negligent, the petition contained a further allegation that the engineer "was also negligent in failing to stop the said block according to the customary method of doing said work as aforesaid, and in causing said block to swing around with unnecessary force and violence, and that as a result of such acts and omissions plaintiff was caused to sustain the said injuries." If it could be said that there was a variance between the proof and the allegations in the petition first noted relative to the manner in which the accident occurred, we think the allegations of the petition last quoted were sufficient to warrant the proof. The variance between the proof that plaintiff at the time of his injury was on a different car from that alleged in the petition was immaterial. No contention is made that the variance, if any, between the proof and the pleadings operated as a surprise to the appellant, nor do we think that the same could have misled the appellant to its prejudice. Longley v. Caruthers, 64 Tex. 287; First Nat. Bank v. Stephenson, 82 Tex. 435, 18 S. W. 583.

[2] It was further alleged in the petition that the engineer, after discovering plaintiff's peril, was guilty of negligence in failing to avoid the injury by stopping the block before it struck the side of the car upon which plaintiff was sitting. Appellant insists that there was no evidence to warrant the submission of that issue. It seems to have been proven beyond controversy that it was plaintiff's duty to watch the movements of the block and to signal the engineer when to start and stop the engine; that on the occasion in controversy the block was dragged in upon a signal given to the engineer by the plaintiff, and that plaintiff did not signal the engineer to stop it; that it was the duty of the engineer to obey the signals given by plaintiff. The engineer testified that when he saw the block leave the ground and begin to swing, not knowing whether it would swing far enough to hit the plaintiff, he called to the plaintiff to look out. He did not cause the block to drop for fear plaintiff might jump, and the block in falling would hit him. According to the undisputed proof, the engineer could have caused the block to drop instantly by raising a lever attached to the engine with his foot. This evidence was sufficient to warrant a finding that the engineer was guilty of negligence in not dropping the block at the time he called to the plaintiff to "Look out!" and that, if he had done so, the injury would have been avoided. Hence, there was no error in submitting the issue of negligence of the engineer after he discovered plaintiff's peril.

[3] We overrule appellant's contention that the evidence was conclusive that plaintiff was guilty of negligence contributing to his injury, and that the court erred in submitting that as a controverted issue. The plaintiff testified that, when the engineer called "Look out!" he looked in the direction of the engineer for the purpose of determining what was meant, and by the time he looked towards the block which was in an opposite direction the block had swung so near him that he was unable to get out of the way of it before it struck his leg; that the block was dragged in on prior occasions slowly and stopped eight feet from the side of the car; that he had no reason to believe that it would be handled in a manner differently on the occasion of the accident until it was too late for him to avoid the injury.

[4, 5] Error has been assigned to the refusal of the following instruction requested by appellant: "It was the duty of Graham to observe the signals as given him by the plaintiff, and to operate the engine in accordance with such signals, and if you believe that the cement block in question was not stopped when it reached a point directly under the end of the boom, and if you further believe that no signal was given the engineer to stop the block at that place, then the engineer would not be negligent in so failing to stop said block if he did so." As this instruction was upon the weight of the evidence and as it eliminated the issue of discovered peril, it was correctly refused.

[6] By another assignment appellant insists that excessive damages were allowed for the injury sustained.

Plaintiff testified in part as follows: "It was my right foot that was caught by that block. It just broke my leg, my foot, right along there through the ankle and mashed it all the way down, near to my toes. My foot was sound and well before that, had never been scratched. * * * My ankle won't stand up. It turns over. * * * My ankle was crushed up, and the bones of this foot here is partly mashed and bruised up, and probably some bones in there broken. No bones have worked out so far, but there is dead bones in there right in that foot right there. They are loose here. I was in the hospital with my leg out there for four months lacking twelve days. * * * I certainly did suffer during that time. When I left the hospital, the condition of my leg was about as you see it here, only you see this scar here was not healed up. I treated that myself. It was two and a half or three months after I left the hospital before that wound healed up. It has been about ten months and ten days since the accident. * * * Certainly there is a stiffness in the joint. I cannot walk barefooted at all. I walk with a high-heeled shoe. * * * My foot is not straight. It inclines out and also it bends over. My foot stands up that way. Certainly it is deformed or out of plumb or line from a natural foot. I would say it is drawn out about four or five

inches, five inches comparing it with my other foot. * * * As to my ankle, I cannot bear my weight. I can walk all around here on a level where I have smooth walking, or even on a walk. I have never when I walk on a walk, used two canes, but when I am walking ·on rocky ground, and am not careful and put the full weight on that, my foot will tip over. It will tip over, and when it tips over it pains me so. That is the reason I walk with two sticks on rough surfaces, but, where it is a smooth surface, I do not need but one stick. I can walk around the house without a stick. * * * Certainly that injured limb swells up on me if I walk long and say I step upon a table, like that, and tip it over, it will swell. I can walk around here half a day, and this would swell up larger than it is. I have not measured to see if there is any difference in the size of my ankle at that point. * * * At the time of this accident my age was 32 years. The Ft. & Denver was paying me $95 per month, and I was making all the way from $25 to $40 out of a boarding outfit in addition to that. I had been able to and had been making wages of that amount about five, a little better than five years. I run a gang at that salary, within $5 of that salary, in 1906. * * * I have not been able to do a day's work since the accident. * * * I have no education to fill a clerical position. I can read and write, but that is about all."

Dr. Warwick, witness for plaintiff, produced X-ray skiagraph pictures of the injured leg, and testified with reference to the pictures as follows: "That shows the fracture of the large bone of the leg. It is a diagonal fracture, and also has a displacement. That is a fragment broken off there or callous—callous is the repaired part of the bone. It shows a mass down there of the bones of the foot. There is no detail to it at all. It shows a jamming. That would not be disclosed as clearly as a break, that just shows a solid mass around there, bone and bone material, all glued together. * * * I examined the man's injury yesterday evening. * * * The only difference ¡I can see in it now is that the external openings through the flesh have healed up, and, when I saw it ten months ago, he had an open sore there. As it stands now, I think it is a permanent injury, and I think he has very good results, about as good as he can get. I do not think in years to come there will be any improvement in his present condition. * * * The ankle joint is slightly limited to a slight motion. * * * I saw it yesterday afternoon, and my movement of it there disclosed to me that it was limited in motion. * * * The break will always be there. I doubt if it will grow less sensitive as he uses it more and more as time goes by, if he can use it more and more. * * * An

injury in the vicinity of a joint is always considered serious."

Dr. Saunders, for defendant, testified relative to the injured ankle: "I find a firm, bony union there. We got a little deformity in the lower end of the bone on account of— I do not know as it is known to us—the bones were jambed, and that the ankle joint is very considerably limited in motion, but the foot is practically at a right angle, which will enable him to walk very well on it. I think it is almost certain that he will never have any perfect motion, never have perfect motion, and there will probably not be very much improvement in the movement of that ankle from this time on. He will probably get a little more motion—little more—but he will not be able to flex up this way, that is below the top up towards the knee. I mean that is pull the toe up towards the knee—not be able to flex it that way, but he will have a strong and very useful joint, but he will walk largely with a stiff ankle joint. It will be just as strong as it ever was."

The amount allowed is greater than we would assess if it were our province to fix it in the first instance, but, after a careful consideration of the evidence, we have concluded with considerable hesitation that we cannot disturb the judgment on the ground of excessiveness. See M., K. & T. Ry. Co. v. Taff, 31 Tex. Civ. App. 657, 74 S. W. 89; I. & G. N. Ry. v. Mercer, 78 S. W. 562; I. & G. N. Ry. Co. v. Walters, 80 S. W. 668.

The judgment is affirmed.